v. City of Farmington Hills v. Michigan Municipal Corporation, et al., Arguments not to exceed 15 minutes per side. Mr. Stefani for the appellants. Good morning. I'm Michael Stefani, appearing on behalf of Sgt. Davis Marshall, and I would like to reserve two minutes' time for rebuttal. Very well. This case involves two white Farmington Hills police officers by the name of Meesters, Officer Meester and Officer Jarrett. Their attempt to administer an additive adjustment to David Marshall, a black Detroit police sergeant. Because according to the officer's own testimony, he was running his mouth and he thought he was somebody special. And when Sgt. Marshall had the nerve to ask for Officer Meester to call a supervisor to the scene, Meester threatened Marshall by saying, I get a supervisor, guess what? Meester told Sgt. Somerville at the end of the stop that Marshall was not showing the respect that Meester deserved. Now, I know that the panel is well prepared. I've been sitting through the prior arguments. But I would urge you, if you have not personally viewed the DVD of the traffic stop, there are two DVDs, one of the processing Sgt. Marshall as a prisoner and one of the traffic stop. If you haven't seen the traffic stop personally, I would urge you to do it because, in my opinion, it clearly shows Officer Meester's intonation and his obvious attitude problem. I have seen the video of the traffic stop. How about your client's attitude as a motorist who was stopped by a police officer? If your client, Mr. Marshall, had stopped the motorist, would he expect the motorist to behave like your client did here? Your Honor, until Sgt. Marshall requested a supervisor, Marshall's conduct was nothing out of the ordinary. He didn't stop promptly when the lights were put on by the police car. Instead, he went to his mailbox and took out his mail. He pulled over to the side of the road on the left-hand side, not the right-hand side. Was his actions the way that he would want the motorist to behave if he stopped the motorist? Your Honor, in all due respect, I have been an FBI agent and I've been a Detroit police sergeant myself. What Sgt. Marshall did was not terribly unusual or disrespectful. In other words, he was already moving to the left-hand side of the road to check his mail when the lights were activated. I saw the lights activated quite a bit farther behind before he pulled over to get his mail. That's not even clear. Plus, Your Honor, you don't always see the lights instantly. I mean, as I can tell you, the number of times police officers complain... Did your client treat the Farmington Monster with the respect that he deserves? Yes, I mean that sincerely. So that's the respect that your client would expect if he stopped the motorist in the city of Detroit? Until he asked for a supervisor to come to the scene. Sgt. Marshall's job is supervising officers in the city of Detroit. How about his refusal to surrender his weapon, his firearm? Isn't that just a matter of safety for officers? And your client, Sgt. Marshall, when he stops and frisks somebody... Isn't he allowed not only to frisk somebody, but to disarm that person for his safety of the officer? Your Honor, in all due respect... Here, isn't your client's refusal to give up his weapon that subjects the officer here to safety concerns? Your Honor, in all due respect to the court's opinion, I respectfully disagree with the court. A police officer, in 33 years, I've never been asked to surrender my weapon. You're not testifying. No, I know that. I'm not going to take a testimony. But I do have expert opinion evidence in here. It doesn't matter who you are. If you're stopped by an officer, and you have a weapon, and he knows you have a weapon, you don't think he has a right to disarm that person who he has stopped for the officer's own safety? Only if he believes the person presents an immediate threat. If a person... The person having a firearm is a safety concern. It doesn't matter who the person is. No, that is not correct. Okay. What does stop and frisk mean? If it doesn't mean stopping, frisking, and disarming for the safety of the officer. Stop... First of all, stop and frisk stands for the jury decision, stands for... Reasonable suspicion that criminal activity is in place. And reasonable suspicion the person is armed and presents a danger. We know he's armed. But the question... If he refuses to give up his weapon, I mean, it's... I don't think there's anything more basic than the right of an officer to have a suspect give up his weapon for the safety of the officer. Your Honor, he has to... He, as a police officer, should know that. Okay, counsel, let me ask you along those same lines. Do you have reference to some case that says that a suspect may lawfully refuse to disarm in the face of a valid request by the police officer? Because it does seem like a pretty basic operating procedure. If there's... If the officer... If the person who's armed presents a danger, then absolutely. I agree with that, and I don't think anybody would question that. But isn't that determination on whether or not the person presents a danger, isn't that a subjective determination to be made by the officer? If an officer feels that somebody presents a danger, it's the officer's call. Yes, Your Honor. The suspect doesn't get to make that determination. Yes, Your Honor. That is absolutely correct. But the facts in this case, that videotape that I'm urging you to look at, demonstrates that this officer did not ask for that weapon because he was concerned with his own safety. He asked for that weapon only after Marshall asked that a supervisor be called. And his conduct clearly demonstrates he was not concerned with his safety. He turned his back on Marshall a number of times. He told Marshall to take the gun out of his holster himself. In all due respect, I know the trial judge didn't agree with me on this, but if you're concerned with your safety, you don't tell the guy you're afraid of to take the gun out of the holster and let him handle it. You tell him not to touch it, and you remove the gun yourself. If you're really concerned with your safety, you draw your weapon. If you're also concerned with your safety, you call for a backup. None of those things happen here. Meester was simply asserting his authority to humiliate Marshall in front of his own house. Marshall is dressed in his Detroit sergeant police uniform. He's got his duty-issue weapon. He's standing in front of his own house. He did not present a danger at all. He never raised his voice contrary until Meester got him out of the car and started patting him down for a second gun. Now, you talk about ridiculous. Here you've got a guy with a .40-caliber block on his hip in a safety holster, and you're going to pat him down for a second gun. He did not have the justification for patting him down for a second gun. He touched on the question whether you have any authority that a police officer may not disarm a suspect after he has stopped that suspect. He didn't answer the question. Do you have any authority that he may not do so? All the authority that gives an officer the right to order a person out of the car, mims, or to confiscate a weapon if he sees a weapon. That authority gives the officer – or those cases give the officer the authority to do that, but under certain circumstances. Okay. Do you have a case that's – That specifically says that an officer cannot take a weapon unless he's concerned for his safety? No, I do not. All right. But all the case law says that he can – he is allowed to exercise that authority if he's concerned for his safety. All right. Is the right here clearly established if you don't have a case at the site? I'm sorry. I didn't understand. I mean, you're arguing a clearly established violation of constitutional rights. I mean, are you able to support that if you don't have a case in front of you? I'm arguing that the trial judge in this case decided facts. Before we get to the issue of – before we get to the issue of qualified immunity, we have the question of was – did the trial judge decide facts that – and draw inferences that he shouldn't have? And it's quite clear here. Judge – the judge said because we – ordinarily, whether there's probable cause, et cetera, is a question of fact to the jury. But if you've got a videotape that shows what occurred, that is controlling, and that eliminates any question of fact. But that's not the case. The videotape shows certain conduct that transpired. How do you interpret that conduct? What inference do you draw from it? That's a factual question, and that's what the trial judge ignored. He drew inferences that simply are not correct. He drew inferences that favored the defendant. Under Rule 65 motion, as this court is well aware – So let's get down to the actual claims. You've got an excessive force claim with the tasing? Yes. Okay, and then you've got a First Amendment claim? Yes. First Amendment retaliation. Correct. And then false arrest. Then false arrest. And if the judge improperly made factual findings, then we don't get to the issue of whether or not, for example, excessive force was used. And that's my position here. The judge clearly jumped to conclusions and laid evidence in favor. You know, someone like – in all respects, someone like Your Honor, Judge Griffin. I mean, you've come out with your opinion in this that just because a person's an arm does not give the police officer the right to take that weapon. The law that gives him the right to do it says if there's an immediate threat. Even a civilian in Michigan who has – You would have us establish the law of the United States that police officers who stop a suspect and only disarm that suspect if there is an immediate threat to the officer. That's what you have. I'm not asking you to establish it. That is the established law. What law do you have? That is the law. Tell me a case you have that says that. Terry V. Ohio. You have to have an immediate danger. Just because a person is armed does not give you the right to confiscate that weapon. Okay, so your position, as I understand it really today, is that this is a case that presents genuine issues of material crime, which makes summary judgment inappropriate for – And you told us also that based on the actions here, the record doesn't demonstrate qualified immunity because the judge, you said, in principle weighed evidence, which is not what you do at summary judgment. That's right. So can we get to where you want us to go without making the determination that Judge Griffin just indicated? Can this case be decided without making that determination? Are you saying that – is it possible that the trial judge weighed the evidence and improperly came up with certain inferences? No, I'm saying can we make the decision that you're asking us to make, reversing the trial judge, without establishing that an officer doesn't have the right to acquire a suspected disarm if there's no showing that the officer is in a reasonable fear of the safety? I'm really interested to hear that a little bit. Do you get what I'm saying? Yes, I do. And I see my time is up. May I answer that? No, I do believe that the law is already established that an officer can only take a weapon if he's concerned about his safety if the person is an immediate danger. That's what Terry says. That's what I believe the Arizona case that follows Terry. And I believe the court would have to decide that in all probability in order to – even if the court were to decide that the trial judge erred in making or coming to conclusions of fact that he shouldn't have, there's still the question, I suppose, and I haven't – I may not be answering that correctly because I haven't given that a great deal of thought. I think I have a sense of your answer. Thank you very much. You'll have your rebuttal. Good morning. Good morning. May it please the court, versus DePan, stand on behalf of the defendants' affiliates in this case? I think that Judge Donald hit on the critical issue in this case, and that's whether, with respect to Paul Fenton, he would be surprised. Thank you. With respect to qualified immunity, whether there was clearly established law that would have forbidden Officer Meester in this case to separate the plaintiff from his revolver, there is no such clearly established law that would – for their own safety to disarm suspects, and we require that there be an immediate danger to that officer. We would have a lot of officers shot. Absolutely. There's no – Every day it stops, and I mean, it would be a horrible situation. Absolutely, Your Honor. There's no requirement that the officer should wait until someone pulls a weapon on him or does – Or that he – that he knows he's dangerous. But didn't the officers in this case invite the suspect to handle the weapon, which would really cut against some fear officers' safety by the officers asking the suspect to handle the weapon by removing it? Well, initially he did ask him to remove the weapon and place it on the seat next to him, and when he refused to do that repeatedly, then he asked him to step out of the vehicle and then was going to pat him down and bring the weapon forward. So by asking a suspect to remove a weapon, that seems to cut against any kind of concerns at that point about an officer being in fear. Well, I don't think initially there was – I don't think initially – I mean, the plaintiff was a police officer. I think that Officer Meester was hoping that he would be compliant and that he would alleviate any kind of concern for his safety. He asked him to remove his weapon and put it on the seat next to him. It was when it escalated thereafter that he felt the need to make sure that he did it and, in fact, remove it for him if he continued to refuse to do it. It was a situation where it started off extremely contentious, but it certainly escalated to that point. And the Supreme Court in 2009 in Arizona v. Johnson – I just want to quote this briefly for the record – explained that traffic stops are especially for all the dangerous police officers. The risk of harm to both the police and occupants of the stopped vehicle is minimized if the officers routinely exercise unquestioned command of the situation. And that, again, supports an officer being able to separate a detainee from a weapon. And in this case, the plaintiff repeatedly refused to do it, and it got to the point where he even followed Officer Meester's – This is my perception, okay? I thought his approach was offensive and shocking. To go marching over to a motorist like that – first of all, I did not have the perception that he refused to stop. I mean, the light went on, and he pretty much pulled over. Did he go ten feet more? Maybe. This was not somebody who was refusing to stop. He pulled right over. The officer is just really angry because he had the nerve to open up his mailbox. And he was unmuscled, and it was, like, totally unjustified. Now, does that mean that the other officer does not have to cooperate? No. But does he stop everybody like that? Well, no, but, Your Honor, if I could address that. I mean, I would agree that everyone could have been nicer in the situation and behaved better. Officer Meester certainly could have behaved better. But when he puts on his light and the plaintiff doesn't pull over for 12 more seconds, and he pulls into the oncoming side of traffic to stop, he cavalierly opens his mailbox to get his mail. The officer approaches and says, it's more important for you to get the mail than to stop. He sees he's a police officer at that point, which, you know, you would be stunned to realize that he was so noncompliant and so cavalier about it, and then he tells him to put the vehicle in park, and the vehicle now lunges forward a couple feet. I mean, it just starts off a very bad sequence of events. But they don't see that each are police officers. I'm sorry, Your Honor. Because at the time, each sees that the other is a police officer. That's correct. Each sees that they're members of the same club. Right. And I think that's part of the problem, is I think that the plaintiff sort of expected to pass in the situation he had indicated to the defendant. I don't think he expected to pass, but I don't think he expected to be treated like that. And if I were a motorist and I was stopped, I wouldn't have expected to be treated like that. Your Honor, I would agree with you, but I also feel like, as motorists, we would be much more compliant than the plaintiff was in this case. It was late at night. He did not stop immediately. He pulled in behind on the side of traffic, cavalierly went to get the mail out of the mail box. It was in the middle of the night, and there was no traffic on the residential street. It was a narrow street. Easier for him to pull over then. I mean, he could have easily pulled over immediately upon the flashers being lit. In any event, okay. So what – I mean, basically what plaintiff is saying is that the officer was not in fear of anything, and he just – he wanted to make a point. But can we just talk about the First Amendment later? Sure. The argument is basically that everything was fine until he opened his mouth and said that he wanted a supervisor and that he wasn't going to comply without a supervisor and that, in effect, they used the taser and retaliated because they didn't like him not following their directions without protest. Well, I think we have to look at the objective facts in the case and review the evidence and all that most favorable to the plaintiff. We review it from the perspective of an officer on the scene. And when the plaintiff – he actually continued to engage Officer Meester every time that Officer Meester would try to conduct the traffic stop properly, ask for his identification. Don't you gave him the ID? Well, eventually. At first it was, don't you see what I'm wearing? Then he gave him his police ID. Then he eventually gave him his driver's license. And as Officer Meester would attempt to go back to his vehicle, then the plaintiff would say, you don't know your law. You've got a problem with me, man. I mean, there were so many things that would come to that. But he never gave up his work. That was the thing. He continued. He refused to give up his work. The police officer has absolute right to disarm the suspect. He refuses to do it. And the defendant didn't physically take it from him because probably somebody would have been shot if he did that. That would be more dangerous to try to physically disarm him. But he would not take it over. And, therefore, it escalated because of the refusal to obey a lawful command of law. That's right. That's why a teaser was used, too. Sure, because he still had the gun. And escalated. I agree. Okay, what if the jury concluded, hypothetically, that Meester never would have asked for the gun, never would have taken it, wouldn't have done any of this if he hadn't asked for a supervisor and questioned his attitude? The Supreme Court case in Reichel that was cited in our brief provides that there's qualified immunity. There's no clearly established law that suggests that it's a First Amendment violation to allegedly retaliate against someone if there's probable cause for the arrest. So there's qualified immunity for the First Amendment retaliation claim, without a doubt. I mean, the right place is very clear on that. So it doesn't even get to the jury. If there's probable cause to arrest the plaintiff, and in this case, there clearly wasn't in the ordinance. We briefed that in detail. Then it doesn't even get to the question of whether there might have been some other motivation, too. The First Amendment claim then fails. And they rebutted the showing of probable cause? Not in this case, no, Your Honor. All they do is argue that it wasn't necessary or whatever it was. They haven't rebutted the showing of the defendant being a probable cause? No, they haven't produced any case law. What case says that you have to show an absence of probable cause on a First Amendment claim that doesn't include malicious prosecution? Well, the Reichel case in our brief – I can give you a slight tweet, Your Honor. Did that involve malicious prosecution? I don't believe so. I think it involved false arrest. But it may have been malicious prosecution, but the point that the court made in that case is the law was severely established. I'm sorry, but this is a claim without – I mean, he – this is a claim that's not dependent on false arrest. Well, the arrest portion is, and that's what they're relying on. They're arguing that it was a First Amendment retaliatory arrest in this case because he, you know, argued with the officer. And what the Supreme Court has said is that there was no clearly established law at this time or even now that would suggest that if there's probable cause, you would still have a claim for a First Amendment retaliatory arrest. And that's Reichel that says that. I think it's a 2012 decision. Well, are we talking about whose burden it is? It may not be the plaintiff's burden to show lack of probable cause in a false arrest case. But once the defendant shows – establishes and states his burden of showing there was probable cause, that there would have been an arrest irrespective of the plaintiff's conduct. That's correct, Your Honor. On a First Amendment retaliation. Yeah, I mean, there's no generation fact here. That's correct. Right. And again, it comes back to the plaintiff does have the burden of qualified immunity to show there was clearly established precedent that the officer was forbidden from separating the plaintiff from the service revolver during the stop. And the plaintiff has failed to do that. The officer commanded them to do it repeatedly.  So you're saying that with respect to this separating the defendant from his weapon, this notion of officer's safety or officer being feared is not a factor that a court considers? Well, it's just something that the court has said an officer can't do. And until the court says – What is something that a court said an officer can't do? Separate a detainee from their weapon. For purposes of qualified immunity, Your Honor, the plaintiff has the burden of showing that there's clearly established law that would have forbidden the officer's conduct. In this case, the plaintiff is arguing that the officer, Officer Meester, was forbidden from taking this gun away from him or requiring him to surrender his weapon. So your point is, when there is an issue of officer safety or subjective fear, that is not a factor that a court considers in an officer's request to take the weapon. Well, I think that that is a consideration. But I think any time that someone is armed, and our Supreme Court, all the case law that really kind of provides the umbrella up here for a traffic stop and officer safety, has suggested there's a number of things that officers can do, not only for their safety, but for the occupants of the vehicle as well. And that is to – So my point to you though is, going back to Mr. Marshall's counsel's position, the fact that in this situation, the officers requested and even permitted the suspect to handle the weapon, actually put his hand on the weapon to remove it, doesn't that create some kind of fact issue about whether or not this whole issue of officer safety was pretext and not the real issue in that situation? Well, I think initially, he was asking him to do it himself. When it became clear that he would not do it voluntarily, tensions then escalated, and I think the fear for his safety increased. And then they separated him from the weapon, and he ended up doing it with a taser, because plaintiff admits that he then put his hand on his revolver before the taser was deployed. And his position was that he was just holding the butt of it to, like, you know, hold it in position so they couldn't take it. But from an officer's perspective, saying that, it looks like you are taking an offensive posture. Okay. And that was the action that precipitated the case? That's correct, Your Honor. I don't have a lot more to add unless the court has any questions. Okay. All right. I move your request to the court of arm. Thank you. Yes, I have a couple of brief points. First of all, sister's argument that they initially asked him to remove his weapon, but later on, somehow they didn't ask him, is not true. Immediately before he was tased, he was told, take your gun out of your holster and put it on the hood of your car. You're not claiming he was about to do that, are you? No, I'm not. It was clear that he testified that he had a safety holster, and the Detroit police are taught to press down on the weapon to prevent the gun from being taken out of your holster, and that is what he was doing. It's interesting, as I sit here, as I sat there, it's clear that Judge White draws different inferences from the tape or the video than Judge Griffin does, and that's my whole point. If you can draw different inferences, then that's a factual question. I still get down to the point that he didn't give up the gun, and so you have to be able to say that an officer would have known that he didn't have the right to get that gun unless he had an actual fear. Yes, and Judge Griffin has said that it would be a terrible precedent to say that an officer needs to be concerned for his safety before he can ask someone to surrender a weapon, and that is the law today. You're not setting a new precedent. The law today is you must have concern for your safety. All of these cases that sister counsel has… The U.S. case is Terry v. O'Reilly in that proposition. I mean, what were the cases? Arizona, the Arizona v. Johnson, MIMS, those cases stand for the proposition that an officer has a lot of authority at a traffic stop because it's inherently dangerous to protect his own safety. MIMS allows the person, the officer, to order somebody out of the car for the officer's safety. If the officer is doing it just to harass the person, another example in that case, that case of Bland, that lady in Texas, where the officer stops her for an illegal signal and orders her to put out her cigarette, well, that's the kind… Now, sure, the officer has the authority, and we would frequently do that as officers, tell somebody to put out a cigar or a cigarette because that can be used as a weapon. But in that Bland case, the lady is saying, hey, you pulled me over for a traffic stop, and I got to put out my cigarette. He wasn't telling her to put it out for safety concerns. He was telling it to assert his authority, that she was being ugly, and he was a cop, and she better adhere to that. And that is exactly what Meester was doing here. I'm not suggesting – I know Sergeant Marshall thought there was an element of grace involved, and I'm not certain there was. I simply think Meester was acting inappropriately, and he might have done it to any Detroit cop because there's a certain amount of jealousy between a small suburban department and a big Detroit police department. That's all I have. I'm out of time. Thank you very much. All right, I believe that concludes the oral argument docket today.